UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

RICHARD PRESS,                                    :

               Plaintiff,                   :          08 Civ. 9497 (PKC) (GWG)

   -v.-                                          :          <u>REPORT AND</u>
                                                             <u>RECOMMENDATION</u>
CONCORD MORTGAGE CORP., GLOBAL       :
HOME LOANS & FINANCE, INC., LEXCAP
FUNDING CORP., SAFE HARBOR CAPITAL     :
FUNDING, GLOBAL/GIRIMONTI LLC, AND
DARON GIRIMONTI,                              :

            Defendants.                  :
-------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

     Plaintiff Richard Press brings this action seeking damages for, inter alia, unlawful

discrimination, unlawful harassment, unlawful retaliation, unlawful termination, breach of

contract, promissory estoppel, unjust enrichment, and conversion.  The defendants are Concord

Management Corporation, Global Home Loans and Finance Incorporated, LexCap Funding

Corporation, Safe Harbor Capital Funding, Global/Girimonti LLC (collectively "Concord"), and

Daron Girimonti.  Press alleges that Concord wrongfully terminated him due to his age and

physical disabilities, and failed to pay him wages and benefits due under an employment

agreement.  Because Concord failed to answer the complaint in this case, the only issues that

remain relate to damages.[1]  For the reasons stated below, Press should be awarded a judgment

against the Concord defendants of $753,284.66 plus prejudgment interest.

---

[1] Press concedes that "Girimonti is not the subject to this application for default
judgment."  <u>See</u> Plaintiff's Proposed Findings of Fact and Conclusions of Law, filed Aug. 31,
2009 (Docket # 31) ("Pl. Prop.") ¶ 2 n.2.  Accordingly, the Court considers liability and any
award of damages solely against the Concord defendants.

I.     BACKGROUND

Press's amended complaint alleges discrimination, harassment, retaliation, and unlawful employment practices in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"); the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et seq. ("ADA"); the Family Leave and Medical Act of 1993, 29 U.S.C. § 2601 et seq. ("FMLA"); the New York State Human Rights Law, N.Y. Exec. L. § 290 et seq. ("NYSHRL"); the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL"); and the Consolidated Omnibus Budget Reconciliation Act of 1986, 29 U.S.C. § 1161 et seq. ("COBRA"). See Amended Complaint, filed Dec. 5, 2008 (Docket # 3) ("Am. Compl.") ¶ 2. Press has also asserted claims for breach of contract, promissory estoppel, unjust enrichment, quantum meruit, failure to pay wages in violation of the New York State Labor Law, N.Y. Lab. L. §§ 190-99 ("Labor Law"), discharge in violation of the Labor Law, N.Y. Lab. L. § 215, and conversion. Id. ¶ 3. Proof of service upon all defendants was filed on April 10, 2009. See Affidavit of Service, filed Apr. 10, 2009 (Docket ## 10-16). No answer was filed by any of the defendants, and Press filed a motion for a default judgment, see Motion for Default Judgment, filed June 25, 2009 (Docket # 19); Certification of Plaintiff's Counsel in Support of Motion for Default Judgment, filed June 26, 2009 (Docket # 21). The district court granted Press's motion against the Concord defendants subject to an inquest to determine damages. See Order Granting Plaintiff's Motion for a Default Judgment, filed July 1, 2009 (Docket # 22).

This Court then directed Press to "file Proposed Findings of Fact and Conclusions of Law concerning all damages and any other monetary relief permitted under the entry of default (or default judgment)" together with supporting affidavits and any documentary evidence to

2

establish the proposed damages. See Scheduling Order for Damages Inquest, filed July 7, 2009 (Docket # 24) ("Scheduling Order") ¶¶ 1-2. The Scheduling Order also directed the defendants to respond to Press's submissions no later than September 21, 2009. Id. ¶ 2. The Scheduling Order put all parties on notice that absent a request from either side for a hearing, the Court would conduct its inquest based solely on the written submissions of the parties. Id. ¶ 3. The plaintiff did not request a hearing. The Court's mailings of this Order to the Concord defendants were returned as undeliverable.

On August 31, 2009, Press filed his submissions.[2] Press seeks to recover $1,389,300.61 in actual damages, $1,389,300.61 in punitive damages, $1,389,300.61 for emotional distress, liquidated damages of $303,333.28 under federal law and $87,241.83 under the Labor Law, $10,350 for attorneys fees and court costs, and an unspecified amount for prejudgment and post-judgment interest. See Pl. Prop. ¶ 129. None of the defendants filed a response.

The Second Circuit has stated that an inquest into damages may be held on the basis of documentary evidence "as long as [the Court has] ensured that there was a basis for the damages specified in [the] default judgment." Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir. 1989); accord Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir. 1997); Action S.A. v. Marc Rich & Co., 951 F.2d 504, 508 (2d Cir. 1991), cert. denied, 503 U.S. 1006 (1992). As plaintiff's submissions provide such a basis, no hearing is required.

II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

---

[2] See Pl. Prop.; Affidavit of Plaintiff Richard Press in Support of Plaintiff's Application for Default Judgment, filed Aug. 31, 2009 (Docket # 32) ("Press Aff."); Certification of Kenneth A. Goldberg (Docket # 33) ("Goldberg Decl.").

In light of the defendants' default, Press's properly-pleaded allegations, except those relating to damages, are accepted as true. See, e.g., Cotton v. Slone, 4 F.3d 176, 181 (2d Cir. 1993) ("factual allegations are taken as true in light of the general default judgment"); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d Cir. 1992), cert. denied, 506 U.S. 1080 (1993). The findings of fact below are based on the allegations in the amended complaint regarding liability and the admissible evidence regarding damages in Press's submissions.

A.    Press's Employment, Discharge, and Defendants' Failure to Pay Wages

Press was employed by one or more of the defendants in New York, New York "from late 2003 through the end of April 2007" when he was unlawfully discharged. Am. Compl. ¶ 26. During that time period, he held the title of Branch Chief Information Officer and Senior Mortgage and Financial Services Consultant. Id. Press was initially hired by an entity named Global. Id. ¶ 27. He was promised a salary of $130,000 per year. Press Aff. ¶ 3. In May or June of 2006, however, the branch office commenced operating under the name of Concord, an entity that "assumed Global's lease, hired its employees, and acquired its accounts and assets." Am. Compl. ¶ 28. Concord was a legal successor to Global. Id. During his employment term, Press had also been paid through LexCap and/or Global/Girimonti.[3] Id. ¶ 29. Press seeks to hold all defendants liable under, inter alia, the "single employer doctrine, alter ego, respondeat superior, joint employer doctrine, agency, [and] successor liability." Id. ¶ 16. The defendants shared offices, id. ¶¶ 5-9, and Girimonti was an officer, executive, branch manager or some

_____

[3] In 2007 or 2008, Girimonti began operating the branch office where Press was employed under the name "Safe Harbor." Am. Compl. ¶ 51. Safe Harbor is a legal successor to that branch office. Id.

combination thereof, of all defendants, id. ¶¶ 10-15, who had authority over Press as his direct

supervisor, id. ¶¶ 31-32.

Press was fully qualified for his position and had a good performance record.  See id.

¶ 30.  He had contributed to the growth of the business by expanding the branch offices where he

worked from roughly four to over 70 employees.  Id.

Press was diagnosed with insulin-dependent diabetes in or about 1999, a fact that he told

Concord after he was hired.  Id. ¶ 33.  Press must receive daily injections of insulin.  See id.; Pl.

Prop. ¶ 12.  In June 2005, Press was severely injured in an automobile accident and suffered

> [b]roken left ribs, broken left shoulder blade, broken left shinbone, broken left
> foot, crushed right wrist, broken right hand, and internal trauma.  Plaintiff has a
> titanium rod and screws inside his body from about his left knee cap to his left
> ankle, and required surgeries . . . .  Press also suffers from Post Traumatic Stress
> Disorder ("PTSD") and physical disabilities relating to various injuries to his
> body.

Am. Compl. ¶ 34.  Press went on a medical leave of absence as a result of his injuries.  Id. ¶ 35.

However, Girimonti called Press during his medical leave and demanded that he return to work.

Id. ¶ 36.  Press returned to work and was discriminated against based on his disabilities and on

his age.  Id. ¶ 37.

First, Press requested and was denied a reasonable accommodation for his disabilities

including a request for help with "certain physical tasks" that were difficult for Press to perform

given his disabilities.  Id. ¶ 38.  From 2005 through 2007, Girimonti and other employees

verbally abused Press by making statements including "pill head, old man, gramps, grandpa, fat

old fuck, and maybe you are too old to work."  Id. ¶ 39 (internal quotation marks omitted).

Second, Girimonti hired younger and able-bodied employees for positions that were inferior to

Press's position, including a receptionist, and paid them higher salaries.  Id. ¶ 40.

Even before Press's automobile accident, Concord failed to pay him the full $130,000 that he was promised.  See Press Aff. ¶ 5; see also Letter from Daron Girimonti (Oct. 26, 2009) (annexed as Ex. A. to Press Aff.) ("2006 Letter") (Press "earns an average of $130,000").  In 2004, Press received approximately $24,500.  Press Aff. ¶ 6.  In 2005, Press received approximately $30,516.  Id. ¶ 7.  In 2006, Press received approximately $21,350.  Id. ¶ 8.  Finally, in 2007, Press received $8,000 through the end of April of that year.  Id. ¶ 9.  The sum total of unpaid wages during this period was $348,967.33.  Id. ¶ 10.  Press complained that he was not being paid and also objected to the harassing and discriminatory treatment to Girimonti, Jay Gold (whom Press believed was Girimonti's supervisor), and John Faracco, the CEO of Global.  Am. Compl. ¶ 42.  Concord failed to investigate these matters or take any remedial action.  Id. ¶ 43.

In early April 2007, Girimonti hired Michael Le, an individual much younger than Press who was not disabled, and instructed Press to train Le.  Id. ¶ 44.  Le was then paid a higher salary than Press.  Id.

Finally, during the last weekend in April 2007, Concord moved the branch office where Press worked from 6 East 32nd Street to 451 Park Avenue South.  Id. ¶ 45.  During the Saturday of that weekend, Press worked for several hours to assist in the office move.  Id.  On that Saturday, Girimonti threatened to punch Press in the face and throw him out of a window.  Id. ¶ 46.  Girimonti then unlawfully terminated Press and told him to "get the fuck out" and said "I never want to see your fucking face again."  Id.  Upon information and belief, Concord "then replaced Press with a younger non-disabled employee."  Id.

Concord had agreed to pay Press $130,000 per year.  See Press Aff. ¶ 3.  When Press was

6

Even before Press's automobile accident, however, Concord failed to pay him the full

$130,000 that he was promised. See Press Aff. ¶ 5; see also Letter from Daron Girimonti (Oct.

26, 2009) (annexed as Ex. A. to Press Aff.) ("2006 Letter") (Press "earns an average of

$130,000"). In 2004, Press received approximately $24,500. Press Aff. ¶ 6. In 2005, Press

received approximately $30,516. Id. ¶ 7. In 2006, Press received approximately $21,350. Id.

¶ 8. Finally, in 2007, Press received $8,000 through the end of April of that year. Id. ¶ 9. The

sum total of unpaid wages during this period was $348,967.33. Id. ¶ 10. Press complained that

he was not being paid and also objected to the harassing and discriminatory treatment to

Girimonti, Jay Gold (whom Press believed was Girimonti's supervisor), and John Faracco, the

CEO of Global. Am. Compl. ¶ 42. Concord failed to investigate these matters or take any

remedial action. Id. ¶ 43.

In early April 2007, Girimonti hired Michael Le, an individual much younger than Press

who was not disabled, and instructed Press to train Le. Id. ¶ 44. Le was then paid a higher

salary than Press. Id.

Finally, during the last weekend in April 2007, Concord moved the branch office where

Press worked from 6 East 32nd Street to 451 Park Avenue South. Id. ¶ 45. During the Saturday

of that weekend, Press worked for several hours to assist in the office move. Id. On that

Saturday, Girimonti threatened to punch Press in the face and throw him out of a window. Id.

¶ 46. Girimonti then unlawfully terminated Press and told him to "get the fuck out" and said "I

never want to see your fucking face again." Id. Upon information and belief, Concord "then

replaced Press with a younger non-disabled employee." Id.

Concord had agreed to pay Press $130,000 per year. See Press Aff. ¶ 3. When Press was

terminated, he was not paid certain wages and benefits owed to him, and he was neither issued a

COBRA notice, nor provided with continuing health insurance coverage.  Am. Compl. ¶¶ 47-48;

Press Aff. ¶¶ 10-16.  Finally, Concord failed to return Press's personal property including a

laptop and related items, personal documents, writing instruments, photographs, and eyeglasses,

see Am. Compl. ¶ 49, valued in total at $5000, Press Aff. ¶ 17.  Press has been unsuccessful in

finding other employment.  Press Aff. ¶ 12.  He has been unemployed since his termination by

Concord in April 2007.  Id.  Currently, Press is 65 years old and he had intended to work until at

least the age of 70.  Id. ¶ 15.

### B.     Press's Claims for Damages

Press has asserted a number of claims for relief but they duplicate each other with respect

to the damages sought.  Accordingly, we frame our discussion of Press's entitlement to a default

judgment in terms of the various types of damages Press claims inasmuch as "[a] plaintiff

seeking compensation for the same injury under different legal theories is of course only entitled

to one recovery."  Indu Craft, Inc. v. Bank of Baroda, 47 F.3d 490, 497 (2d Cir. 1995),

cert. denied, 519 U.S. 1041 (1996).

### 1.     Pre-termination Unpaid Wages

Press argues that he was not paid his full salary from 2004 up through his termination in

April 2007.  He seeks the remainder of his unpaid salary, or $348,967.33.  While his allegations

regarding the salary he was promised are somewhat conclusory, see Press Aff. ¶ 3, 5-9, the Court

will accept that they are sufficient to show that he was not paid the amounts to which he was

entitled.[4]  Accordingly, we find that Press is entitled to $348,967.33 either on his breach of

contract claim (that is, on the ground that he was not paid the full amount to which he was

promised) or, alternatively, as pre-termination backpay on his federal discrimination claims on

the ground that the discriminatory animus against him on account of his age and disability

caused his employers to pay him less salary than that to which he was entitled.  See 29 U.S.C.

§ 623(a)(1); 42 U.S.C. § 12112(a) (barring discrimination in the "terms" and "conditions" of

employment on account of age or disability).

2.      Post-termination Lost Wages

Plaintiff has alleged facts sufficient to show that he was "discharge[d] . . . because of

. . . [his] age" in violation of the ADEA, 29 U.S.C. § 623(a)(1), and was discriminated against

under the ADA, 42 U.S.C. § 12112(a), as well as under the other employment discrimination

statutes he relies on.  "A plaintiff who has proven a discharge in violation of the ADEA is, as a

general matter, entitled to backpay from the date of discharge until the date of judgment."

Kirsch v. Fleet Street, Ltd., 148 F.3d 149, 167 (2d Cir. 1998) (citations omitted); Gilbert v.

Hotline Delivery, 2001 WL 799576, at *2 (S.D.N.Y. July 10, 2001) (citation omitted).  Such an

award can include "lost salary, raises, and fringe benefits."  Gilbert, 2001 WL 799576, at *2

(citations omitted).  However, the individual who is the victim of discrimination also has a duty

to mitigate his damages.  See, e.g., Greenway v. Buffalo Hilton Hotel, 143 F.3d 47, 53-55 (2d

Cir. 1998) (ADA); Hamilton v. Niagara Frontier Transp. Auth., 2008 WL 4724324, at *1

(W.D.N.Y. Oct. 24, 2008) (FMLA incorporates common law duty to mitigate); Vernon v. Port

---

[4] The letter supplied by plaintiff from Girimonti, see 2006 Letter, does little to shed light
on this issue as it is arguably inconsistent with plaintiff's assertions as to what he was actually
paid.

8

Auth. of N.Y. & N.J., 220 F. Supp. 2d 223, 234-35 (S.D.N.Y. 2002) (ADEA); Lightfoot v. Union

Carbide Corp., 110 F.3d 898, 908 (2d Cir. 1997) (NYSHRL), cert. denied, 528 U.S. 817 (1999);

Lopes v. Caffe Centrale LLC, 548 F. Supp. 2d 47, 49 (S.D.N.Y. 2008) (NYCHRL); Cornell v.

T.V. Dev. Corp., 17 N.Y.2d 69, 74 (1966) (breach of contract).

 The standard used to award backpay and front pay in ADEA cases is the same in

discrimination cases brought under the FMLA and the ADA.  See Palma v. Pharmedica

Commc'ns, Inc., 2003 WL 22750547, at *17 (D. Conn. Sept. 30, 2003) (FMLA backpay);

Brenlla v. LaSorsa Buick Pontiac Chevrolet, Inc., 2002 WL 1059117, at *9-10 (S.D.N.Y. May

28, 2002) (FMLA front pay); E.E.O.C. v. Yellow Freight System, Inc., 2002 WL 31011859,

at *28 (S.D.N.Y. Sept. 9, 2002) (ADA backpay); Brady v. Wal-Mart Stores, Inc., 2005 WL

1521407, at *7 (ADA front pay).  This standard is also applicable in cases arising under the

NYHRL and the NYCHRL.  See Shannon v. Fireman's Fund Ins. Co., 136 F. Supp. 2d 225, 228

n.4 (S.D.N.Y. 2001).

 Press argues that he is entitled to backpay from the date of his termination until August

2009 in the amount of $303,333.28.  See Press Aff. ¶ 13; Pl. Prop. ¶¶ 36, 38.  While Press asserts

that he has been unemployed since his termination despite reasonable efforts to mitigate, Press

Aff. ¶ 12, he provides absolutely no details on the steps he has taken to seek employment.  His

evidence on this point consists of a single conclusory sentence: "Since the date of my

termination, I have made a reasonable effort to mitigate my damages and find other employment,

but have been unsuccessful."  Press Aff. ¶ 12.  This statement, however, is insufficient to allow

this Court to make a finding that Press made appropriate efforts to mitigate damages.  The

conclusory nature of the allegation gives the Court no information as to what efforts Press made

to find employment.  Accordingly, Press cannot obtain a recovery for backpay.  Cf. Becerril v. E.

Bronx NAACP Child Dev. Ctr., 2009 WL 2611950, at *4 (S.D.N.Y. Aug. 18, 2009) (Title VII

plaintiff was "reasonably diligent" in contacting over 50 employers and provided court with

"contemporaneous handwritten notes, documenting her attempts to find new employment"),

adopted by 2009 WL 2972992 (S.D.N.Y. Sept. 17, 2009).

        3.     Front Pay

Press contends that but for the unlawful termination, he intended to work at least another

five years, when he would be 70 years old.  Press Aff. ¶ 15.  Accordingly, he seeks front pay for

each of five years, from 2009 through 2014, at $130,000, for a total of $650,000.  See id. ¶ 14.

Front pay is an equitable remedy available under the ADEA.  See Whittlesey v. Union Carbide

Corp., 742 F.2d 724, 727-28 (2d Cir. 1984); accord Vernon, 220 F. Supp. 2d at 236.  "In

deciding whether an award of front pay is appropriate, a court should consider (1) whether

reinstatement [is] either impossible or impracticable[;] (2) whether the plaintiff has a reasonable

prospect of obtaining comparable employment; and (3) whether the calculation of front pay

would involve undue speculation."  See Becerril, 2009 WL 2611950, at *5 (citing Shannon, 136

F. Supp. 2d at 233) (quotation marks omitted) (brackets in original).

In the instant case, there is no evidence as to whether reinstatement is impossible or

impracticable.  However, given the nature of the comments directed toward Press, even if

reinstatement were feasible, it is not an appropriate option.  In any case, we need not consider

this remedy because Press seeks front pay "in lieu of reinstatement."  See Pl. Prop. ¶ 55.  As to

the second factor, Press has provided no evidence whatsoever on his future employment

prospects.  Finally, in light of the dearth of evidence on Press's employment prospects, the

calculation of front pay would involve undue speculation. Case law makes clear that to be awarded front pay, "a claimant is required to 'use reasonable diligence in finding other suitable employment.'" Padilla v. Metro-North Commuter R.R., 92 F.3d 117, 125 (2d Cir. 1996) (citing Ford Motor Co. v. EEOC, 458 U.S. 219, 231 & n.15 (1982)), cert. denied, 520 U.S. 1274 (1997); see also Whittlesey, 742 F.2d at 728-29 ("an award of front pay in lieu of reinstatement does not contemplate that a plaintiff will sit idly by and be compensated for doing nothing, because the duty to mitigate damages by seeking employment elsewhere significantly limits the amount of front pay available" (citation omitted)). Because Press has not provided any evidence of his efforts at mitigation or as to why he will not be able to find employment in the future, he is not entitled to an award of front pay.

### 4.    Lost Benefits

In addition to wages, Press asserts that he is entitled to receive $82,000 in lost benefits. Press Aff. ¶ 16. The only lost benefits he identifies, however, are his health insurance benefits, which he asserts have a value of "$1,000 per month." Id. He states he is seeking compensation for these benefits from the termination of his employment (in April 2007) through August 2009, or $22,000.[5] Id. Press also seeks five years of front pay for this benefit, or $60,000. Id.

The goal of the federal, state, and city employment discrimination statutes is to make the victim whole. See Landgraf v. USI Film Prods., 511 U.S. 244, 254 (1994); Shannon, 136 F. Supp. 2d at 230, 233. Press has not set forth any evidence on the economic injuries he suffered in the past through loss of his health insurance benefits – for example, by offering proof of medical bills he was forced to cover on his own or of any costs to him for the purchase of

---

[5] In fact, the time period asserted by Press here is 28 months, not 22 months.

11

replacement health insurance. Nor has he indicated that he will incur expenses in the future for health insurance. In light of the absence of any evidence on these points, he is not entitled to any damages for past or future benefits lost.[6]

     5.    <u>Liquidated Damages</u>

Press asserts that he is entitled to liquidated damages under the ADEA, the FMLA, and under the Labor Law. Under the ADEA, liquidated damages in an amount equal to a plaintiff's award for backpay and benefits is appropriate where the statutory violation was "willful." <u>See</u> 29 U.S.C. § 626(b); <u>McGinty v. State</u>, 193 F.3d 64, 69 (2d Cir. 1999). In light of the fact that the allegations of the amended complaint suggest willfulness on the defendants' part, the Court will award $348,967.33 as liquidated damages.[7]

     6.    <u>Pension and Retirement, Value of Personal, Sick, and Vacation Days</u>

Press has sought to be compensated for various other benefits including pension and

---

[6] Press also argues that Concord violated COBRA by failing to issue a COBRA notice to him upon his termination. <u>See</u> Am. Compl. ¶ 48. Generally, COBRA requires an employer carrying a group health plan to extend 18 months of continuation coverage to employees terminated for reasons other than gross misconduct. 29 U.S.C. §§ 1161(a), 1162(2)(a)(i), 1163(2). A failure to comply with COBRA, such as a failure to provide a terminated employee with the proper notice upon request, may result in an award of statutory damages of up to $100 per day. <u>See</u> 29 U.S.C. § 1132(c)(1)(B); <u>Colodney v. Continuum Health Partners, Inc.</u>, 2004 WL 829158, at *12 (S.D.N.Y. Apr. 15, 2004). Such an award is discretionary, however. 29 U.S.C. § 1132(c)(1). Here, no such award is appropriate in light of the fact that Press has shown no prejudice whatsoever resulting from this failure. Moreover, Press's COBRA claim is inadequately pled inasmuch as the statute requires a plaintiff to "(1) allege the existence of a qualified healthcare plan governed by COBRA; (2) name the plan administrator as a defendant; and (3) allege that his employer is the plan administrator if no separate administrator has been designated." <u>Colodney</u>, 2004 WL 829158, at *12. None of these elements has been clearly stated in Press's amended complaint.

[7] Press does not argue that he is entitled to separate awards of liquidated damages under more than one statute.

retirement, his 401(k), and a valuation of his personal, sick, and vacation days.  Am. Compl.

¶¶ B, G, M, Q, U.  Press has offered no admissible evidence, however, that would allow a

valuation of any of these benefits.  Accordingly, they cannot form part of the default judgment.

      C.     Conversion of Press's Property

To state a claim for conversion under New York law a plaintiff must show:

"(1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the

property or interference with it, in derogation of plaintiff's rights."  Colavito v. N.Y. Organ

Donor Network, Inc., 8 N.Y.3d 43, 50 (2006) (citations omitted).  Press is entitled to recover

$5000 as compensation for the conversion of his laptop and related items, personal documents,

writing instruments, photographs, and eyeglasses.  See Pl. Prop. ¶ 29; Am. Compl. ¶ 49; Press

Aff. ¶ 17.

      D.     Emotional Distress

Courts have identified three categories of emotional distress or mental anguish claims.  In

the "garden-variety" emotional distress cases, a plaintiff describes his emotional distress in

"vague or conclusory terms."  Rainone v. Potter, 388 F. Supp. 2d 120, 122 (E.D.N.Y. 2005).

"Significant" or "substantial" emotional distress claims "consist of more substantial harm,

usually evidenced through medical testimony or documentation."  Becerril, 2009 WL 2611950,

at *6 (citing Rainone, 388 F. Supp. 2d at 122-23).  "'Egregious' emotional distress claims

. . . 'have only been warranted where the discriminatory conduct was outrageous and shocking or

where the physical health of the plaintiff was significantly affected.'"  Id. (citing Rainone, 388 F.

Supp. 2d at 123).

Press's sole evidence on emotional distress is the following assertion in his affidavit: "I

13

have suffered substantial emotional distress. . . ." Press Aff. ¶ 19. Given the conclusory nature of this allegation and the lack of any supporting detail, Press has provided evidence to support only "garden variety" emotional distress damages.

In the "garden variety" emotional distress cases, "awards hover in the range of $5,000 to $30,000." Kinneary v. City of N.Y., 536 F. Supp. 2d 326, 331 (S.D.N.Y. Feb. 13, 2008) (citing Bick v. City of N.Y., 1998 WL 190283, at *25 (S.D.N.Y. Apr. 21, 1998)) (quotation marks omitted); accord Rainone, 388 F. Supp. 2d at 122 ($5,000 to $35,000); Fowler v. N.Y. Transit Auth., 2001 WL 83228, at *13 (S.D.N.Y. Jan. 31, 2001) ($5,000 to $30,000). In Kinneary, the court remitted an award of $125,000 to $25,000 where the plaintiff claimed that he felt embarrassed and disappointed over losing his job, having to rely on the financial support of others, and having to remove his daughter from her school for financial reasons. 536 F. Supp. 2d at 332. The court found it significant that he did not testify to seeking psychological or medical treatment or that any "particular life activities" were "curtailed" by his distress. Id.

In light of the absence of any evidence at all showing specific and concrete examples of mental anguish and/or emotional injuries suffered by Press, the Court finds that an award of $5,000 in compensatory damages for emotional distress is appropriate.

E.    Punitive Damages

A plaintiff may be entitled to punitive damages under the ADA when he "demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to [his] federally protected rights." See 42 U.S.C. § 1981a(b)(1).[8]

---

[8] Plaintiffs may not recover punitive damages under the ADEA, see Johnson v. Al Tech Specialties Steel Corp., 731 F.2d 143, 146-48 (2d Cir. 1984), or the FMLA, see Roff v. Low Surgical & Med. Supply, Inc., 2004 WL 5544995, at *10 (E.D.N.Y. May 11, 2004).

In addition, "the imposition of punitive damages under both federal and local law is governed by the federal standard." Farias v. Instructional Sys., Inc., 259 F.3d 91, 102 (2d Cir. 2001).  An entitlement to punitive damages requires a plaintiff to prove that his employer "intentionally acted with the knowledge that it may be acting 'in violation of' the law, even if it did not know it was 'engaging in discrimination.'" Tse v. UBS Fin. Servs., Inc., 568 F. Supp. 2d 274, 309 (S.D.N.Y. 2008) (citing Farias, 259 F.3d at 101).  Press asserts that Concord's conduct constituted intentional or at least reckless discrimination and has provided some evidence to support this conclusion.  See Am. Compl. ¶¶ 60-62, 64.  While we accept his proof on this point, we are still faced with the limitations under the ADA that the sum of any emotional distress damages and punitive damages may not exceed $50,000 for employers with 101 or fewer employees.  42 U.S.C. § 1981a(b)(3)(a).  In light of the fact that Concord is not alleged to have had as many as 101 employees, see Am. Compl. ¶ 30, we deem it appropriate to limit the award of punitive damages under the ADA to $45,000, given that plaintiff is being awarded $5,000 in emotional distress damages.  While state law does not provide a cap for punitive damages, the limitation in federal law seems reasonable in this case even for the state law claims, and thus, we would award $45,000 even if we were considering the state claims alone.

F.     Attorney's Fees and Costs

Under the ADA, "the court . . ., in its discretion, may allow the prevailing party . . . a reasonable attorney's fee, including litigation expenses, and costs."  42 U.S.C. § 12205; see also Buckhannon Bd. & Care Home, Inc. v. W. Va. Dep't of Health & Human Res., 532 U.S. 598, 601 (2001).  Attorney's fees are also available under the ADEA, see Lightfoot, 110 F.3d at 913; the FMLA, see 29 U.S.C. § 2617(a)(3); the NYCHRL, see N.Y.C. Admin. Code § 8-502(f); and

15

the Labor Law, see N.Y. Labor Law § 198(1-a).[9]

       1.    Fees

    It is well established that "any attorney . . . who applies for court-ordered compensation in this Circuit . . . must document the application with contemporaneous time records . . . specify[ing], for each attorney, the date, the hours expended, and the nature of the work done." N.Y. State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136, 1148 (2d Cir. 1983). A submission of a summary of contemporaneous time records is a permissible substitute for submission of the records themselves. See, e.g., Cruz v. Local Union No. 3 of Int'l Bhd. of Elec. Workers, 34 F.3d 1148, 1160-61 (2d Cir. 1994); Johnson v. Kay, 742 F. Supp. 822, 837 (S.D.N.Y. 1990).

    While in Cruz the Second Circuit accepted a "typed listing of [attorneys'] hours from their computer records" in lieu of contemporaneous records, it did so where the record showed that the attorneys "made contemporaneous entries as the work was completed, and that their billing was based on these contemporaneous records." 34 F.3d at 1160; see also Kay, 742 F. Supp. at 837 ("Where the attorneys have provided the court with affidavits that have been reconstructed from contemporaneous records and that set forth all charges with specificity, fees have not been denied."). Here, plaintiff's attorney gives a listing of hours but provides no admissible evidence that the listing is based on a compilation of contemporaneous time records. Because courts routinely decline to award fees when a party submits a fee request that fails to indicate that it is based on contemporaneous time records, see, e.g., Ermenegildo Zenga Corp. v.

---

[9] "[T]he NYSHRL does not provide for an award of [attorney's] fees." Lighfoot, 110 F.3d at 913 (citing N.Y. City Bd. of Educ. v. Sears, 83 A.D.2d 959, 960 (2d Dep't 1981)).

56th Street Menswear, Inc., 2008 WL 4449533, at \*6 (S.D.N.Y. Oct. 2, 2008); Joe Hand

Promotions, Inc. v. Fofana, 2007 WL 2298372, at \*7 (S.D.N.Y. Aug. 9, 2007); Kingvision

Pay-Per-View, Ltd. v. Arnoat, 2007 WL 2076632, at \*7 (S.D.N.Y. July 13, 2007), fees should

not be awarded here.

        2.    Costs

An award of attorney's fees should "'include those reasonable out-of-pocket expenses

incurred by attorneys and ordinarily charged to their clients.'" LeBlanc-Sternberg v. Fletcher,

143 F.3d 748, 763 (2d Cir. 1998) (quoting U.S. Football League v. Nat'l Football League, 887

F.2d 408, 416 (2d Cir. 1989)). Press requests $350 for the cost to file this suit. This cost is

recoverable. See id.; Tr. of Unite Here Nat'l Health Fund v. Bag Specialist, Inc., 2008 WL

4695024, at \*5 (S.D.N.Y. Oct. 20, 2008).

Summary

      Press should be awarded damages as follows:

      $348,967.33 for lost wages.

      $348,967.33 for liquidated damages.

      $5,000 for his conversion claim.

      $5,000 in compensatory damages for emotional distress.

      $45,000 in punitive damages.

      $350 for the cost of filing this suit.

The total sum of these awards without interest is $753,284.66.

In addition, Press should be awarded prejudgment interest on his claims for back wages

(that is, the pre-termination backpay he lost on account of discrimination) and on his award of

liquidated damages.  See, e.g., Sharkey v. Lasmo (AUL Ltd.), 214 F.3d 371 (2d Cir. 2000).  In a case where a plaintiff recovers on a claim for backpay of wages under both federal and state law, courts in this circuit apply a federal interest rate to the award of prejudgment interest.  See Kuper v. Empire Blue Cross & Blue Shield, 2003 WL 23350111, at *3 (S.D.N.Y. Dec. 18, 2003) ("Where . . . a judgment is based on violations of both federal and state law, courts in this circuit uniformly have applied a federal interest rate . . . .") (collecting cases), adopted by 2004 WL 97685 (S.D.N.Y. Jan 20, 2004).  In addition, the Second Circuit in Saulpaugh v. Monroe Cmty. Hosp., 4 F.3d 134, 144-45 (2d Cir. 1993), cert. denied, 510 U.S. 1164 (1994), held that a court should calculate prejudgment interest in a federal discrimination case based upon a compound rate of interest.  4 F.3d at 145 ("Given that the purpose of back pay is to make the plaintiff whole, it can only be achieved if interest is compounded.").

In the instant case, the award of damages is based on violations of federal and state law. Therefore, Press should be ordered to submit his calculation of interest using a federal compound interest rate (assuming he wishes to pursue his claim for prejudgment interest). The interest would apply to the total of the back wages and liquidated damages.  See Reichman v. Bonsignore, Brignati & Mazzotta P.C., 818 F.2d 278, 281-82 (2d Cir. 1987) (prejudgment interest available for liquidated damages awarded under the ADEA).  This calculation should be submitted to the Court prior to the entry of judgment.

The judgment should run against defendants Concord Management Corporation, Global Home Loans and Finance Incorporated, LexCap Funding Corporation, Safe Harbor Capital Funding, and Global/Girimonti LLC.

18

Conclusion

Judgment should be awarded against defendants Concord Management Corporation,

Global Home Loans and Finance Incorporated, LexCap Funding Corporation, Safe Harbor

Capital Funding, and Global/Girimonti LLC, jointly and severally, in the amount of $753,284.66

plus prejudgment interest. Press should be required to provide a calculation of this interest using

the federal prejudgment interest rate.

## PROCEDURE FOR FILING OBJECTIONS TO THIS
## REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties have fourteen (14) days from service of this Report and Recommendation

to serve and file any objections. See also Fed. R. Civ. P. 6(a), (b), (d). Such objections (and any

responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. P.

Kevin Castel, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any

request for an extension of time to file objections must be directed to Judge Castel. If a party

fails to file timely objections, that party will not be permitted to raise any objections to this

Report and Recommendation on appeal. See Thomas v. Arn, 474 U.S. 140 (1985).

Dated: December 7, 2009
       New York, New York

_____
GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Kenneth Andrew Goldberg
Goldberg & Fliegel LLP
60 East 42nd Street, Suite 3421
New York, NY 10165

19

Concord Mortgage Corp.
C/o Richard B. Chiert
315 Maple Street
West Hempstead, NY 11552

Concord Mortgage Corp.
25 Melville Park Road, Suite 110
Melville, New York 11747

Concord Mortgage Corp.
451 Park Ave South
New York, New York 10016

Safe Harbor Capital Funding
10 East 29th St. Apt 22D
New York, NY 10016

Safe Harbor Capital Funding
451 Park Ave South
New York, New York 10016

Global/Girimonti LLC
200 Park Avenue South
New York, NY 10012

Global/Girimonti LLC
6 East 32nd St.
New York, NY

Global/Girimonti LLC
451 Park Ave South
New York, New York 10016

Global Home Loans & Finance Inc.
350 Motor Parkway
Hauppauge, New York 11788

Global Home Loans & Finance Inc.
200 Park Avenue South
New York, NY 10012

Global Home Loans & Finance Inc.
6 East 32nd St.
New York, NY

20

Lexcap Funding Corp.
31 Old Brook Road
Dix Hills, NY 11746

Lexcap Funding Corp.
10 East 29th St. Apt 22D
New York, NY 10016